## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

SAMANTHA WALTER,         :   Case No. 3:16-cv-144
                              :

        Plaintiff,           :

vs.                           :   Magistrate Judge Sharon L. Ovington
                              :   (by full consent of the parties)

NANCY A. BERRYHILL,       :
COMMISSIONER OF THE SOCIAL   :
SECURITY ADMINISTRATION,    :
                              :

        Defendant.        :

---

## DECISION AND ENTRY

---

## I.    <u>Introduction</u>

Plaintiff Samantha Walter brings this case challenging the Social Security Administration's denial of her application for Disability Insurance Benefits. She applied for benefits on August 4, 2012, asserting that she could no longer work a substantial paid job due to anxiety, depression, panic attacks, post-traumatic stress disorder, and obesity. Administrative Law Judge (ALJ) Christopher L. Dillon concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Dillon's non-disability decision.

## II.    <u>Background</u>

Plaintiff asserts that she has been under a "disability" since July 25, 2012. She was twenty-three years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). She has a high school education. *See id.* § 404.1564(b)(4).

### A.    **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Dillon that when she has a panic attack, she gets pain in the left side of her chest and down the left side of her arm; her mouth goes numb (sometimes); she breathes heavily; her pulse rate increases; she cries; and she feels like she needs to get away from everyone. (Doc. #6, *PageID* #70). When she has a panic attack at home, she goes into her bedroom. *Id.* If it gets too bad, she goes to the hospital. *Id.* at 71. If she is playing outside with her child and sees a person, she goes inside. *Id.* When asked why, she explained, "I'm just scared. Scared to be around those people. Scared that they may know me, know my history, and my past, or if it's a stranger I just get scared that they may notice something about me and confront me, or just in general the fear of being around any type of person other than those of close relation." *Id.* at 71-72. If she is at someone else's house, she goes into the bathroom, outside, or away from people. *Id.* at 71. She does not want anyone to see her have a panic attack. *Id.* "Sometimes when I'm alone and I have a panic attack, I'm afraid of

being around people, but I'm also afraid of being alone, and having a panic attack, and not being able to get anywhere, and feeling like I'm going to die." *Id.* at 70.

Plaintiff's panic attacks sometimes have a specific trigger. *Id.* at 66. For example, when she has a list of chores, she will "[m]ost always" have an attack. *Id.* at 72. A sink full of dishes, a load of laundry in the dryer, a really fussy baby, or a cluttered/dusty home may also cause one. *Id.* But, a majority of the time, there is no trigger. *Id.* at 66. Even if she is watching TV or is by herself, she has panic attacks. *Id.* They usually last one to two hours and happen five to six times in a week. *Id.*

Plaintiff's mother, who lives five minutes away, and her mother-in-law, who also lives very close, help Plaintiff with her child. *Id.* at 65. Because her panic attacks come on very quickly, "[a]s soon as I feel any tightness in my chest, or the symptoms I know that are going to start causing me to have a panic attack, I will call [my mom] right away before it goes into a full-blown panic attack." *Id.* at 67. For example, when her child starts crying, her anxiety starts, and she calls one of them to help her with him until she can calm down. *Id.* at 65.

Plaintiff is also agoraphobic. *Id.* at 67. It "came along with the panic." *Id.* She is still able to go where there are people, but she cannot do it by herself—she always takes someone with her. *Id.* But even when she has people with her, she still has panic attacks. *Id.* at 74. If she is in a store with someone and she starts feeling one, she will give the list to the other person and go to the car to be by herself. *Id.* At least once or twice per week, she will go to a store with someone but will not be able to make it into the front door. *Id.*

Plaintiff is able to drive but is very scared to. *Id.* at 66. The fear started when she started having panic attacks. *Id.* She also has many other fears including: drinking caffeine; being in her house with the doors unlocked; going outside; running into someone she knows; being around people when she is having a panic attack; and worrying that the other person will notice that she is anxious or panicky. *Id.* at 69.

She explained that she would not be able to work in a job where she did not have to deal with the public and sat in a cubical all day because "My focus is very off. I require a lot of medication throughout the entire day. So, I would have to constantly have medication with me. If there was a complication, say if I was in a cubical, a computer, and there was a small complication, a very small problem could trigger me very, very quick." *Id.* at 69-70.

### B.     Medical Opinions

#### i.     Irfan Dahar, M.D.

Plaintiff's treating psychiatrist, Dr. Dahar, first saw Plaintiff on March 11, 2013, and sees her approximately once per month. *Id.* at 406. On July 1, 2013, he completed a mental impairment questionnaire. *Id.* at 406-09. Dr. Dahar diagnosed agoraphobia with panic disorder and generalized anxiety disorder and assigned a current global assessment of functioning score of 40. *Id.* at 406. He identified several of her signs and symptoms including: poor memory, sleep disturbance, personality change, mood disturbances, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or

isolation, decreased energy, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility/irritability. *Id*.

Dr. Dahar opined that Plaintiff has "severe to debilitating anxiety [with] panic attacks, can no longer drive or go into public places alone. Panics even when others are driving. Depression is moderate [and] marked by loss of interests, poor functioning at home, [and] low self esteem." *Id.* at 407. Additionally, she has extreme difficulties in maintaining social functioning. *Id.* at 408. She is also extremely limited in her ability to sustain an ordinary routing without special supervision; work in coordination with or in proximity to other without being distracted by them; complete a normal workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and travel in unfamiliar places or use public transportation. *Id.* at 408-09. She has marked restrictions of activities of daily living. *Id.* at 408.

Further, Dr. Dahar noted that her "condition is expected to be a long-standing problem [and] progress is slow." *Id.* at 407. Her prognosis is "guarded." *Id*. Dr. Dahar opined Plaintiff would be absent from work more than three times per month due to her impairments and treatment. *Id.* at 408.

### ii.    Beth Vehre, M.D.

Dr. Vehre, Plaintiff's treating primary-care physician, completed interrogatories on October 23, 2013. *Id.* at 690-95. Dr. Vehre last saw Plaintiff on October 21, 2013,

and Plaintiff has been their patient since August 22, 2003.[1] *Id.* at 690. Dr. Vehre opined that Plaintiff's panic disorder is "complex [and] difficult to control despite counselling, meds, [and] psychiatric management." *Id.* at 691. Dr. Vehre stopped treating Plaintiff's panic disorder in February 2013 when she began treatment for her mental impairments with Dr. Dahar. *Id.*

Dr. Vehre opined Plaintiff could not be prompt and regular in attendance because she would have frequent absences due to her panic disorder. *Id.* at 691. Additionally, she could not respond appropriately to supervision, co-workers, and customary work pressures. *Id.* at 692. She has difficulty tolerating daily life stresses. *Id.* She could sustain attention and concentration on her work but only when she is not having a panic episode. *Id.* She can relate predictably in social situations, "but not in [a] good way, may be predicted [to] have panic episode." *Id.* Plaintiff is not able to complete a normal workday or workweek without interruption from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable numbers and lengths of rest periods. *Id.* at 695. Dr. Vehre explained that Plaintiff has "at least daily panic episodes [and] constant anxiety." *Id.*

### iii. Timothy Smith, LPCC

Mr. Smith, Plaintiff's treating counselor since September 2009, completed three mental impairment questionnaires. He indicated that he sees her weekly, and she is very compliant with treatment. *Id.* at 375, 378. He opined, "With medication management

---

[1] Dr. Vehre noted, "Our patient since 8/22/2003." (Doc. #6, *PageID* #690). It is unclear if that is when Dr. Vehre began treating her or if that is when Plaintiff began treatment at their practice.

[and] counseling[,] symptoms have continued to persist. … With all the work Samantha is doing[,] she continues to be severely impacted by anxiety [and] panic." *Id.* at 403.

Mr. Smith noted Plaintiff has recurrent panic attacks, social withdrawal/isolation, and generalized persistent anxiety. *Id.* at 402. He indicated Plaintiff's signs and symptoms of anxiety include heart palpitations, difficulty breathing, nervous stomach, sweating, paralyzing fear, and impending doom. *Id.* at 374. She is, at times, "easily distracted" by anxiety and its symptoms. *Id.* at 375.

Plaintiff's ability to adapt to situations is poor. *Id.* Additionally, she has a poor stress tolerance and needs frequent breaks to manage stress/anxiety. *Id.* at 377. On average, Plaintiff's impairments and treatment would cause her to be absent from work more than three times per month. *Id.* at 404. She has marked deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; moderate difficulties in maintaining social functioning, and slight restrictions of activities of daily living. *Id.*

### iv. Alan R. Boerger, Ph.D.

Dr. Boerger evaluated Plaintiff on December 18, 2012. *Id.* at 293-98. He diagnosed panic disorder with agoraphobia and depressive disorder, not otherwise specified, and assigned a global assessment of functioning score of sixty. *Id.* at 297. He opined, "Ms. Walter appears to have chronic problems with anxiety but more recent onset of a panic disorder. She does have a history of traumatic experiences early in life in the form of witnessing a rape and being a victim of rape. There also appear to be indications of chronic mild depression." *Id.* Additionally, "Because of the longstanding nature of

her emotional difficulties, emotional symptoms are likely to be present for the indefinite future." *Id*.

Dr. Boerger did not find any indications of a memory impairment. *Id.* at 298. He noted that she reported "being distracted at times by her own thoughts and worry[,]" but she only made three errors in performing serial sevens. *Id.* She also reported "some guardedness and slowness to trust others." *Id.* However, she related in an appropriate manner with Dr. Boerger, and he did not find any other indications of difficulty relating to others. *Id.* He concluded, "Ms. Walter's anxiety and depression may limit her ability to tolerate work pressures in the work setting." *Id.*

### v.   Robyn Hoffman, Ph.D.

Dr. Hoffman reviewed Plaintiff's records on April 26, 2013. *Id.* at 93-106. She found Plaintiff has one severe impairment:  an anxiety disorder; and two non-severe impairments:  obesity and an affective disorder. *Id.* at 99-100. She has a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* at 100. Dr. Hoffman opined, "[Plaintiff] is easily distracted by anxiety and situations.  Poor coping and responses to stress. … Her tasks should not require her to fill large quotas or work at a fast-pace …." *Id.* at 102. She "is able to maintain superficial interaction with others in the workplace." *Id.* at 103. And, because her "symptoms may be exacerbated by stressful situations[,] [s]he should perform work that has infrequent changes and does not have fast paced demands." *Id.*

## III.    **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(E). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.    **The ALJ's Decision**

As noted previously, it fell to ALJ Dillon to evaluate the evidence connected to

Plaintiff's application for benefits. He did so by considering each of the five sequential

steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached

the following main conclusions:

| | |
|---|---|
| Step 1: | Plaintiff has not engaged in substantial gainful employment since July 25, 2012. |
| Step 2: | She has the severe impairments of obesity; an affective disorder; and an anxiety disorder. |
| Step 3: | She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |

| Step 4: | Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "work that involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds; no more than pushing or pulling of similar amounts; sitting, standing, and walking for up to 6 hours each; no more than occasional interaction with supervisors and coworkers; no more than incidental/superficial contact with the public, such as sharing common areas like hallways and elevators; and no more than simple, routine, repetitive tasks performed with a pace and stress tolerance that allows for no production quotas." |
|---|---|
| Step 5: | She could perform a significant number of jobs that exist in the national economy. |

(Doc. #6, *PageID* #s 41-51). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 50.

## V.    Discussion

Plaintiff contends that the ALJ erred in rejecting the opinions of Plaintiff's treatment providers and failed to adequately explain the weight he assigned the opinions of the State agency consultants. The Commissioner maintains that the ALJ reasonably weighed the medical opinions of record.

### A.    Medical Opinions

Social Security Regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical

> source who regularly treats the claimant (a "treating source")
> is afforded more weight than that from a source who has
> examined the claimant but does not have an ongoing
> treatment relationship (a "nontreating source"). In other
> words, "[t]he regulations provide progressively more rigorous
> tests for weighing opinions as the ties between the source of
> the opinion and the individual become weaker.".

*Id.* (quoting in part Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2,

1996), and citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)–(2)). To effect this hierarchy,

the Regulations adopt the treating physician rule. The rule is straightforward:

> Treating-source opinions must be given "controlling weight"
> if two conditions are met: (1) the opinion "is well-supported
> by medically acceptable clinical and laboratory diagnostic
> techniques"; and (2) the opinion "is not inconsistent with the
> other substantial evidence in [the] case record."

*Id.* at 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741

F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how

much weight is appropriate, must consider a host of factors, including the length,

frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any

other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight

placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory

"good reasons" requirement is satisfied when the ALJ provides "specific reasons for the

weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p,

1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

In ALJ Dillon's discussion of the weight he assigned to the opinions of Plaintiff's treating physicians, Dr. Dahar and Dr. Vehre, he failed to refer to the treating physician rule or either of its conditions. The ALJ's failure to address the treating physician rule erroneously ignores the hierarchy established by the Regulations and fails to give any deference to treating physician's opinions. This constitutes error. *See* 20 C.F.R. § 404.1527(c)(2) ("[W]e give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations ....").

Nevertheless, ALJ Dillon did provide some reasoning for the weight he assigned their opinions.

### *Dr. Dahar*

ALJ Dillon assigned Dr. Dahar's medical source statement "little weight." (Doc. #6, *PageID* #48). Although the ALJ did not refer to Dr. Dahar by name, the ALJ did acknowledge that he is Plaintiff's treating psychiatrist. And, he found Dr. Dahar's opinion that Plaintiff has marked difficulties in performing activities of daily living and extreme difficulties in maintaining social functioning was "contrary to other significant evidence of record, including the claimant's own statements and testimony concerning

her ability to perform activities of daily living." *Id.* The ALJ provided no further explanation or citation to the record.

Although the ALJ did not provide an explanation for the weight he assigned Dr. Dahar's opinion, earlier in his decision, he found that Plaintiff has no restriction in activities of daily living: "She has reported that she is able to be the primary caregiver for her infant son and that she is capable of performing household chores, preparing meals, and maintaining her personal care." *Id.* at 45. This summary, however, is somewhat misleading.

Under the Regulations,

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation …. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
>
> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities *if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.*

20 C.F.R. § 404, Subpt. P, App. 1, 12.00(C)(1) (emphasis added).

The activities emphasized by the ALJ illustrate Plaintiff's limitations rather than her abilities to perform activities of daily living. For example, although Plaintiff is the "primary caregiver for her infant son," her mother and mother-in-law help "[a]lmost

every other day." (Doc. #6, *PageID* #65). And, a list of household chores will "[m]ost always" trigger a panic attack. *Id.* at 72. She "might be able to make [it] through the first couple of tasks, but after that [she] will have a panic attack." *Id.* These limitations are consistent with Dr. Dahar's opinion that Plaintiff has marked difficulties in performing activities of daily living. This is a fatal flaw in the ALJ's evaluation of Dr. Dahar's opinion. *See Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011) ("the ALJ's focus on the claimant's ability to do certain activities in discounting the treating source's opinion does not constitute "good reasons" for doing so when the claimant's testimony and other record evidence contradict the ALJ's finding.") (citing *Johnson v. Comm'r Soc. Sec.,* 652 F.3d 646, 652 (6th Cir. 2011)).

The ALJ further found that Plaintiff has no more than moderate difficulties in social functioning: "She reported that she has panic attacks around crowds of people and that she tries not to leave her home unaccompanied. However, she has indicated that she is able to go shopping in stores and she has reported having a good relationship with family members, especially her mother and mother-in-law." *Id.* at 45 (citing Ex. 2F [*PageID* #s 293-99]). Again, this is somewhat misleading.

The Regulations explain,

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by

> such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. …

20 C.F.R. § 404, Subpt. P, App. 1, 12.00(C)(2).

The ALJ's summary of Plaintiff's social interactions overstates her abilities. For example, Plaintiff did report being able to shop in stores. However, she also stated that she has to have someone with her, she sometimes has to leave the store in the middle of shopping, and she sometimes cannot even make it into the store before starting to feel panic. (Doc. #6, *PageID* #74). She also reported having a close relationship with her mother and mother-in-law but, other than her husband and child, they are the only people with whom she has a close relationship. Additionally, Dr. Boeger noted that she does not usually have any visitors, she does not belong to any clubs, and she will walk out of a place that has too many people. *Id.* at 295.

The ALJ erred by selecting specific portions of the record that supported his conclusions and omitting conflicting evidence. "[A] substantiality of evidence evaluation does not permit a selective reading of the record. 'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted).

This likewise leaves the ALJ's decision without "good reasons" for assigning Dr. Dahar's opinions "little weight"—another error. *See* Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion …."); *see also Gayheart,* 710 F.3d at 377 ("The failure to provide 'good reasons' for not giving [the treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation.") (citing *Wilson,* 378 F.3d at 544).

*Dr. Vehre*

ALJ Dillon similarly assigned Dr. Vehre's medical source statement "little probative weight." (Doc. #6, *PageID* #48). The ALJ noted that her "opinion concluded that the claimant is not capable of maintaining regular work attendance, responding appropriately to supervision, withstanding normal work pressures, behaving in an emotionally stable manner, or completing a normal work day and work week without interruption from psychologically based symptoms." *Id.* The ALJ found that those "limitations are not reflected in the claimant's primary care treatment notes that consistently recorded her as having an appropriate affect and demeanor with normal thought process and psychomotor functioning." *Id.* (citing Exhibits 6F 1-13 [*PageID* #s 333-45] and 15F at 3 [*PageID* #653]). The ALJ also noted that Dr. Vehre had not treated Plaintiff for her mental impairments since February 2013. *Id.* at 48.

The records cited by the ALJ do refer to appropriate affect and demeanor and normal psychomotor functioning. However, those references appear in only a small

portion of the notes from those appointments—and are a vast distance away from the full picture of those appointments. For example, on July 11, 2012, and September 12, 2012, Dr. Vehre noted, "appropriate affect and demeanor; normal psychomotor function; *speech pattern: [difficult] to stay on one topic of discussion, continually bouncing topics around*; thought/perception: denies suicidal ideation[.]" *Id.* at 340, 343 (emphasis added). But, perhaps more significantly, Dr. Vehre also indicated, "Patient to be evaluated for panic disorder. Her anxiety disorder was originally diagnosed 2 years ago. Her symptom complex includes apprehension, chest pain, a choking or smothering sensation, feeling of impending doom, hyperventilation, insomnia, palpitations, increased perspiration, shortness of breath, tachycardia, [shaky], nausea, and tearful. True panic attacks occur in addition to generalized anxiety. The frequency [of her] symptoms is nearly constant…." *Id.* at 342.

On December 29, 2012, and February 28, 2013, Dr. Vehre's notes changed slightly: "appropriate affect and demeanor; normal psychomotor function; thought/perception: denies suicidal ideation[.]" *Id.* at 334, 337. On December 29, 2012, Dr. Vehre also noted, "Referral initiated to licensed clinical counsellor, to continue sessions. She knows I would like psychiatrist referral but right now as meds are limited due to pregnancy the impact of medications are limited by pregnancy and lactation limitations…." *Id.* at 338. Dr. Vehre also prescribed a new medication, BuSpar. *Id.* On February 28, 2013, Dr. Vehre increased Plaintiff's dose of BuSpar from twice per day to three times per day. *Id.* at 335. She further indicated Plaintiff was unemployed and "feels overwhelmed by panic, unable to work." *Id.* at 333.

The ALJ's narrow interpretation of Plaintiff's treatment notes ignores evidence that detracts from his conclusion. This constitutes error. *See Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013).

Last, the ALJ is correct that Dr. Vehre had not treated Plaintiff for her mental impairments since February 2013—approximately eight months before she provided her assessment. However, it is equally important to note that Dr. Vehre indicated Plaintiff had been a patient of her practice since August 22, 2003. (Doc. #6, *PageID* #690). And, Dr. Vehre treated Plaintiff's mental conditions from at least July 7, 2010 until February 2013. *Id.* at 679.

The reasons provided by ALJ Dillon for discounting Dr. Vehre's opinion are not supported by substantial evidence and do not constitute "good reasons" under the Regulations. *See* Soc. Sec. R. 96-2p, 1996 WL 374188, at *5; *Gayheart,* 710 F.3d at 377.

### Dr. Hoffman

ALJ Dillon observed that the assessment of State agency record-reviewing physician, Dr. Hoffman "concluded that the claimant's mental impairment symptoms result in no more than moderate work limitations and that she is able to perform work with no production quotas, infrequent work changes, and no more than superficial interactions." (Doc. #6, *PageID* #47). He assigned the opinion "great probative weight" because it "is based on a review of the medical evidence of record and the expressed limitations are consistent with the record as a whole." *Id.*

ALJ Dillon is correct that Dr. Hoffman's opinion is based on a review of medical evidence. Indeed, that is all it is based on, as Dr. Hoffman did not examine or treat

Plaintiff.  Dr. Hoffman's opinion, however, is not based on a review of all of the medical

evidence.  Most significantly, he did not review the opinions of Plaintiff's treating

physicians, Dr. Vehre and Dr. Dahar, or the (most recent) opinion of Plaintiff's treating

counselor, Mr. Smith.[2]  The ALJ's failure to consider this shortcoming constitutes error.

*See Blakley,* 581 F.2d at 409.

The ALJ's finding that Dr. Hoffman's opinion was consistent with the record as a

whole is conclusory because the ALJ failed to provide any further explanation or citation

to the record.

The ALJ did not discuss any other factors.  This constitutes error because "[u]nless

a treating source's opinion is given controlling weight, the administrative law judge must

explain in the decision the weight given to the opinions of a State agency medical or

psychological consultant…."  20 C.F.R. § 404.1527(e)(2)(ii).

In addition, the ALJ erred by failing to apply the same level of scrutiny to

reviewing psychologists' opinions as he applied to treating source's opinion.  *See*

*Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL

374180, at *2) ("A more rigorous scrutiny of the treating-source opinion than the

nontreating and nonexamining opinions is precisely the inverse of the analysis that the

regulation requires.").  The ALJ criticized Dr. Vehre's opinion because she had not

treated Plaintiff for her mental impairments since February 2013, but he does not

recognize that Dr. Hoffman never examined or treated Plaintiff.

---

[2] Mr. Smith, although not an "acceptable medical source," was an "other source" who was entitled to
consideration in light of his expertise and treatment relationship with Plaintiff.  *See Cole,* 661 F.3d at 939.

*Dr. Boerger*

The ALJ found that the evaluation of the consultative psychological examiner, Dr. Boerger, "concluded that the claimant has difficulty with being distracted and a limited ability to tolerate work pressures." (Doc. #6, *PageID* #47). He assigned it "great weight" because "[t]he expressed limitations and abilities in this opinion are based on a direct observation and examination of the claimant …." *Id.*

The ALJ is correct that Dr. Boerger's opinions are based on his observation and examination of Plaintiff. It is unclear how this fact alone supports the ALJ's conclusion that Dr. Boerger's opinion is entitled to great weight. This is particularly puzzling because the ALJ failed to recognize that both of Plaintiff's treating physicians based their opinions on their observations and numerous examinations of Plaintiff. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2)

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

### B.     Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's

opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1.      The Commissioner's non-disability finding is vacated;

2.      No finding is made as to whether Plaintiff Samantha Walter was under a "disability" within the meaning of the Social Security Act;

3.      This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4.      The case is terminated on the Court's docket.

Date:  September 1, 2017                    *s/Sharon L. Ovington*
                                            Sharon L. Ovington
                                            United States Magistrate Judge